[Cite as *In re C.R.*, 2020-Ohio-2970.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re C.R., B.R.

Court of Appeals Nos. OT-19-035
OT-19-037
OT-19-045

Trial Court Nos. 2018-JUV-140
2018-JUV-141

**DECISION AND JUDGMENT**

Decided: May 13, 2020

* * * * *

Angelina Wagner, for appellant P.R.

A.R., pro se appellant.

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Dina Shenker, Assistant Prosecuting Attorney, for appellee.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} In this consolidated appeal, appellant, P.R., the natural parent[1] of minors

C.R., age 3, and B.R., age 1, appeals from the August 16, 2019 judgment of the Ottawa

---

[1] G.R., the natural father of the children, is not a party to this appeal. Furthermore, appellant's other children, J.T. and A.T. are not the subject of this appeal.

County Court of Common Pleas, which placed these children in the permanent custody of the Ottawa County Department of Job and Family Services (hereinafter "the agency"). The maternal grandfather, A.R., also appeals from the same judgment. For the reasons which follow, we affirm.

{¶ 2} P.R. asserts a single assignment of error on appeal:

The trial court's finding that the children could not reasonably be reunified with a parent was against the manifest weight of the evidence.

{¶ 3} A.R. did not include assignments of error as required by App.R. 16(A)(3) with references to the record. He did, however, include issues presented for review, which we will treat as assignments of error:

1) Whether the weight of evidence warranted the denial of the maternal grandfather, A.R., motion to intervene. [sic]

2) It should be reviewed how Connie North and the Ottawa County Department of Job and Family Services did their Jobs [sic] during the course of this case.

{¶ 4} A caseworker attested in her initial report and affidavit filed on March 21, 2018, and at the disposition hearing that the agency received several complaints of physical abuse of the children in November 2017, and January 2018. These complaints were based on allegations of domestic violence and exposure to drug trafficking and drug abuse. Upon investigation, the parents admitted to drug use and smoking marijuana but

2.

denied drug trafficking and domestic violence, and no evidence of physical abuse of the children was substantiated. However, the agency was given a copy of the mother's post on Facebook: "I stuck up for you when you broke my shoulder," which was taken down shortly after it was posted and determined during one investigation that the father had a bad and violent temper, the parents smoked marijuana and drank alcohol in front of the children, J.T., a 6 year-old, was left in charge of her younger siblings, and the house had a serious roach infestation. While the parents agreed to voluntarily place the children in protective services and participate in case plan services, they did not cooperate to meet with the agency.

{¶ 5} In early February 2018, C.R. and B.R. were moved to the home of the maternal grandmother and J.T. and A.T. to the home of a paternal aunt and uncle while the mother healed from a broken shoulder and the father attempted to resolve the roach infestation. In early March 2018, the agency was notified that the paternal grandmother, who was known to traffic in drugs, moved C.R. and B.R. to her home in Florida. The agency was also notified by two reliable sources that the parents were planning to take their other two children, J.T. and A.T., to Florida on spring break. Both sources were concerned that the parents were permanently moving to Florida. The agency contacted the mother on March 20, 2018, and both the mother and father became argumentative and threatened to take the children to Florida that night. Based on concerns the parents were fleeing the jurisdiction of the agency and the children would remain in danger because of

3.

the exposure to drug use and domestic violence, the agency immediately sought emergency custody of all four children and an ex parte order was issued by the court.

{¶ 6} A "complaint" consisting of an affidavit of the agency's caseworker and a report signed by the caseworker on agency letterhead was filed on March 21, 2018. In the report, the caseworker asserts the agency sought emergency and temporary custody of the four children. The caseworker asserted the children remain in danger when left in the custody of the parents because of the exposure to drug use and domestic violence.

{¶ 7} Based on a stipulation between the parents and agency, the children were adjudicated dependent and neglected on April 17, 2018, and allegations of abuse were dismissed. On May 25, 2018, the agency was awarded temporary custody of the children. On April 26, 2018, a case plan had been established requiring that the mother participate in mental health, drug, and alcohol diagnostic assessments and complete the recommendations, obtain financial stability and fulfill support requirements, obtain safe and stable housing, comply with case management and home management requirements, successfully complete parental education programs, successfully complete a batterer's intervention program [later determined to be inappropriate for her and replaced with IOP and individual therapy], submit to random drug screens, and refrain from consuming alcohol or illegal drugs while caring for or supervising her children. A similar case plan was established for the father.

{¶ 8} A.R., the paternal grandfather, filed a petition for legal custody of all four children on June 29, 2018, and moved to intervene on February 14, 2019. On April 16,

4.

2019, the trial court denied A.R.'s motion to intervene. The court found A.R. had not established he has a legal right to custody or visitation with the children and therefore did not meet the definition of "party" as set forth in Juv.R. 2(Y).

{¶ 9} The agency moved for permanent custody of C.R. and B.R. on February 21, 2019[2] pursuant to R.C. 2151.413(A) and 2151.414(B)(1)(a). The agency asserted the children could not be placed with their parents within a reasonable period of time and should not be placed with either parent because both parents had made insufficient progress on their case plan goals and objectives despite the agency's reasonable efforts to assist them (R.C. 2151.414(E)(1)), failed continuously and repeatedly to substantially remedy the conditions which caused removal, and the mother suffers from chemical dependency that is so severe that she unable to provide an adequate permanent home now and within one year (R.C. 2151.414(E)(2)), and the parents have demonstrated a lack of commitment toward the children by failing to take action to provide an adequate permanent home for them (R.C. 2151.414(E)(4)).

{¶ 10} A hearing on the agency's and A.R.'s motions was held on June 24 and July 29, 2019. On June 24, the trial court denied the oral motions of the parents to continue the hearing to enable the parents to have additional time to complete the case plan objectives because the case had been pending more than a year and the children were in need of permanent placement.

---

[2] The agency moved for legal custody of J.T. and A.T. as well, but those children are part of a separate appeal.

5.

{¶ 11} Since the parents consented to an adjudication of neglect and dependency, the only issue at trial was the disposition of the children. The following evidence was submitted.

{¶ 12} The initial caseworker for the agency testified regarding the initial investigations and initial case plan objectives discussed above. A second ongoing caseworker testified about the implementation of the case plan. Regarding the mother, the caseworker testified she worked with the parents to eliminate the roach infestation but the landlord did not take responsibility and the parents' efforts were not successful because the entire building was infested. The parents were eventually evicted in May 2019, and at the time of the hearing remained homeless.

{¶ 13} Regarding the remaining case plan requirements, the caseworker found the mother was cooperative in the beginning and attended mental health services and parenting classes. However, once the father was incarcerated, she stopped going to mental health services and parenting classes, did not cooperate to arrange planned visits, and started having positive drug screens. The mother gave numerous excuses but refused transportation assistance. Ultimately, the mother completed a budgeting class, but never fully completed the parenting classes. She also failed to remain drug free, testing positive off and on for illegal drugs, and she admitted to using drugs and buying drugs from a friend. As late as June 7, 2019, the mother refused a drug screen, which is considered an automatic positive result. The mother never obtained permanent employment and indicated she could not work because she was in pain and had applied for disability.

6.

Once the agency moved for permanent custody, the mother indicated she was not going to work on her case plan anymore since she was not going to get her kids back. The caseworker denied ever telling the mother she would never be reunified with her children and had, in fact, encouraged the mother to continue services and informed her that unannounced visits would have to continue.

{¶ 14} Regarding the father, the caseworker testified the father completed a lot on his case plan, although he was not initially cooperative with meetings. However, he was required to participate in other services, which were eventually terminated. He never finished the parenting classes. He tested positive for opiates as well as alcohol and THC in December 2018, and refused a drug screen on June 7, 2019. While the father indicated a desire to work toward reunification and separate from the mother because she was holding him back, the mother and father were found together at an unannounced visit in June 2019. The caseworker did not believe reunification with father was possible within the next 90 days, but might be possible in 6 months.

{¶ 15} Both parents attended visitation, although the father's visitation ended with his incarcerations. They attended regularly and had positive interactions.

{¶ 16} The caseworker testified they permitted A.R. to have visitations while considering him as a possible person to whom legal custody could be awarded. However, she had some concerns about his ability to care for the children: On an outing to the beach, A.R. left B.R. on the shore while he took C.R. into the water. Another time, the foster parent reported C.R. had a sunburn after being with A.R. On one visit, the

7.

caseworker noted C.R. was not wearing her glasses, which were needed to correct a disorder, and A.R. only stated she did not want to wear them. Despite repeated requests, A.R. would not move C.R.'s toddler bed out of the living room and into a bedroom with an older child. Finally, when the agency removed the children after bruises were found on B.R., roaches were observed in A.R.'s home. Even though the bruises were found to have been Mongolian birthmarks, visitations did not resume because of the roach infestation. A.R. refused to return to supervised visitation at first, but later returned with the mother. The caseworker did not return to visit A.R.'s home because he refused to work with the caseworker. More recently drug screenings show positive results for THC.

{¶ 17} The agency also considered D.B. as legal custodian for the older two children. She and their paternal grandfather had a long-term relationship of at least ten years or more, and she has had a grandmother relationship with the older children. D.B. testified she was committed to keeping all four children connected with each other, the parents, and A.R.

{¶ 18} The caseworker also testified that C.R. and B.R. were eventually placed with a foster family with children who indicated a desire to adopt both children. The foster family also developed an open line of communication with D.B. and the parents.

{¶ 19} The ongoing caseworker recommended termination of the parents' rights and that the court award permanent custody to the agency for purposes of adoption by the foster family. The caseworker based her recommendation on the need for permanency, the indications that the parents will not make further progress on the case plans, and that

8.

the foster family and D.B. have indicated they will foster relationships between the children and with the children's natural family.

{¶ 20} A mental health clinical coordinator for Firelands Counseling and Recovery testified the mother made little to no progress in her treatment, primarily from missed appointments and a failure to follow treatment recommendations. The coordinator was unable to testify to any length regarding the father's assessment and treatment because he did not consent to release of his records and she was never ordered to bring his records.

{¶ 21} The specialized docket coordinator for the Ottawa County Juvenile Court, testified the mother and father were terminated from participation in the court's family dependency specialized docket (H.O.P.E.) for noncompliance. During the program, the mother was tested for drugs 38 times and had 4 no shows and 25 positive screens, and the mother was able to produce a prescription for only some of the positive screens. Furthermore, the coordinator was unable to resolve the discrepancy in the screenings where the mother had a prescription for hydrocodone but was testing positive for opiates, not oxycodone. In December 2018, the mother tested positive for illegal drugs and did not have a prescription. She admitted to using a substance which had not been prescribed to her. The coordinator testified the mother never advanced out of phase one of the program because her behavior was mixed, sometimes positive and plugged in but in the end she never actually complied. By the end, the mother was disconnected, showed no emotion, and was no longer vested in the program. The father was also terminated

9.

because of his positive screens for marijuana use, and a failure to advance out of stage one. He was always engaged, but did not believe he needed treatment.

{¶ 22} The CASA representative testified she visited A.R. just prior to the hearing and found the mother was there. The mother said she was living in her car, which had a missing window, and spent her days with A.R. or friends. The CASA representative thought the mother seemed unusual that day. A.R. yelled to the mother and her friends that they had better not be doing anything when the representative came inside. The mother's eyes were wide and glazed and dilated. The volunteer also found that A.R. refused to comply with recommendations to move C.R.'s bed, ensure C.R. wore her glasses, or to stop using inappropriate medication on B.R.'s gums for teething. He also rejected a recommendation to limit the children's electronic use. The representative also questioned A.R. about his medical status, and he stated that his doctor indicated he has high blood pressure issues for which he takes medication when he feels the need. At visitations, the representative observed the mother and A.R. brought a lot of snacks, that A.R. allowed B.R. to have candy even though he was a baby, and did not supervise J.T. who wandered out of the room. However, the representative did observe that the parents loved the children and wanted to interact with them. Because the parents still needed stable housing, employment, negative drugs screens, and the father need to separate from the mother to be successful, she opined reuniting the family would not be in the children's best interests. She recommended permanent custody of C.R. and B.R. be awarded to the agency.

10.

**{¶ 23}** The father testified he completed the substance abuse program in prison and has learned coping skills and anger management techniques regarding the use of drugs. Since his last release, he admitted he is homeless with no expectation of finding a place to live in the near future. The mother has received assistance for an apartment, but they have been unable to find one. While he works two jobs, he testified he has very limited funds after garnishment of his child support obligation. He believed he had completed all the programs required and is a great father. However, he admitted to daily use of marijuana, and believed there was nothing wrong with using illegal drugs and raising kids.

**{¶ 24}** While the mother admitted to homelessness, she testified she was approved for housing assistance and is waiting for approval of an apartment. She testified she worked on case plan until the caseworker told the mother in December 2018, she would not get her kids back. The mother believed her main issue was becoming drug free and that if she had more time, she could finish the case plan. She testified she only had three parenting classes to finish. The mother believed her father, A.R., would be good with all the children.

**{¶ 25}** A.R.'s testimony from an April 12, 2018 hearing was stipulated into this hearing. At that hearing, A.R. asserted his supervised visitations were limited by the agency to once a month as a grandparent. He admitted to having been convicted of DUI in 2000 and 2008 and to drinking alcohol off and on, but asserted he knows his limits. He admitted he was unaware of any special needs of C.R. and B.R. At the permanent

11.

custody hearing, he also testified that he expected to rely upon his Social Security income, food give-a-ways, food stamps, and assistance from churches and other support groups to provide for the needs of the children. He denied ever having told the caseworker about his medical issues. He also denied that B.R. was at risk during the beach trip because A.R. was not far away and B.R. was asleep. He believed the caseworker falsely accused him of abusing the baby to remove the kids, and she never let them return to his home. He believed he was able to care for the children.

{¶ 26} On August 16, 2019, the trial court issued its decision denying A.R.'s motion for legal custody and granting the motion of the OCDJFS for permanent custody of the children. The court also found the agency made reasonable efforts to assist the parents to achieve reunification of the family. Nonetheless, while the mother made some progress on her case plan objectives, her progress slowed over time and she failed to complete the plan by the time of the hearing because she did not resolve her drug dependency and never obtained employment or housing. The court found that while the father made some progress on his case plan objectives, he also did not successfully complete the case plan, continues to use illegal drugs, remains homeless, and is unable to provide for his children. Therefore, the court found, "by clear and convincing evidence that the parents failed to continuously, repeatedly and substantially remedy the conditions that initially caused the children to be placed outside the children's home" and that the rights of the parents should be terminated. The court also found the children "cannot be

12.

placed with either of their parents within a reasonable time and should not be placed with them."

{¶ 27} As to placement of the children with A.R., the court found that he is 68 years of age and his only source of income is Social Security. While he completed some parenting classes, there were concerns about his ability to enforce the requirement that C.B. wear eyeglasses and comply with agency recommendations. He also had recently tested positive for THC and there are concerns the mother and father are living with A.R.

{¶ 28} Upon a review of the standards of R.C. 2151.414(D)(1), the court found by clear and convincing evidence that granting permanent custody of C.R. and B.R. to the agency was in the best interests of the children and that it was not in the best interests of the children to have legal custody placed in the maternal grandfather, A.R.

## Mother's Appeal

{¶ 29} On appeal, the mother asserts that the trial court's finding that the children could not reasonably be reunified with her was against the manifest weight of the evidence. Since only the mother filed a notice of appeal, we consider this assignment of error as it relates to her interests.

{¶ 30} A motion for permanent custody was filed by the agency pursuant to R.C. 2151.413(A). R.C. 2151.414 governs the procedure and standards of the juvenile court for ruling on the motion and gives the juvenile court the discretion to award the agency permanent custody of the child upon making two factual findings. R.C. 2151.414(B)(1). First, the juvenile court must find by clear and convincing evidence that "it is in the best

13.

interest of the child" to permanently terminate parental rights and "grant permanent custody to the agency that filed the motion." *Id*. When determining the best interest of the child, the court shall consider all relevant factors, including those set forth in R.C. 2151.414(D)(1). Second, the juvenile court must also find by clear and convincing evidence that one of the factors of R.C. 2151.414(B)(1) applies. In this case, the juvenile court found:

> [t]he child is *not abandoned or orphaned*, has *not* been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * *and* the *child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents*. R.C. 2151.414(B)(1)(a) (emphasis added).

**{¶ 31}** If the trial court finds that any one or more of the factors of R.C. 2151.414(E)(1)-(16) exist, the court must find the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. In this case, the court found that the following subsections (1) and (16) existed:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the

14.

parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(16) Any other factor the court considers relevant.

{¶ 32} On appeal, we will not reverse a trial court's decision in a permanent custody case unless it is contrary to the manifest weight of the evidence. *In re J.H.*, 6th Dist. Lucas No. L-19-1295, 2020-Ohio-2658, ¶ 18; *In re K.L.*, 6th Dist. Lucas No. L-17-1201, L-17-1210, 2017-Ohio-9003, ¶ 24.  A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the judgment than not. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-21 (applying *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997) to civil cases).  A judgment "supported by competent, credible evidence going to all essential elements of the case" is not contrary to the manifest weight of the evidence. *Karches v. City of Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

15.

{¶ 33} In this case, the mother asserts that there was no clear and convincing evidence to support the R.C. 2151.414(E) finding that the children could not be placed with a parent within a reasonable time or should not be placed with either parent. She contends the evidence establishes that the mother had only a short lapse in progress on her case plan, she had done well in services, she consistently visited the children, and she was willing to re-engage in services. Furthermore, she asserts the father completed most of his case plan services and could have been reunited with the children within six months. Finally, she argues there was no demonstration as to why this case could not have been extended to 24 months so the parents could have completed their case plans. She relies upon *In re M.P.*, 9th Dist. Lorain No. 14CA010678, 2015-Ohio-2226, ¶ 45, and R.C. 2151.419(A)(2).

{¶ 34} First, R.C. 2151.419(A) is not applicable to a disposition order rendered under R.C. 2151.414(A). However, R.C. 2151.414(E)(1) does require that the juvenile court find the agency made "reasonable case planning and diligent efforts * * * to assist the parents." *Id*. at ¶ 15.

{¶ 35} Under the current statutory provisions, there is no longer a requirement that an agency must have had temporary custody for a minimum amount of time before it could move for permanent custody. *In re A.M.*, 4th Dist. Athens Nos. 17CA32, 17CA36, 2018-Ohio-646, 105 N.E.3d 389, ¶ 113, citing *In re Brenna E.*, 124 Ohio App.3d 143, 145, 705 N.E.2d 728 (6th Dist.1997) (other citations omitted). The only requirement is that the agency provide the parents with "reasonable case planning and diligent efforts."

16.

{¶ 36} Upon a review of the record, we find there was clear and convincing evidence to support the juvenile court's factual findings. Furthermore, the juvenile court's determination that the agency made reasonable efforts to assist the parents for purposes of reunification with their children and that the children could not be placed with a parent within a reasonable time or should not be placed with either parent were not contrary to the manifest weight of the evidence.

{¶ 37} The children were removed on March 20, 2018, and case plan services were provided from that time until the date of the disposition hearing in June and July 2019. While the parents were given over 12 months to complete their case plan services, they failed to do so. It was clear by the time of the hearing that the parents would or could not comply with the case plan requirements. There was no justification for the agency to give the parents additional time to comply, especially in light of the fact that C.R. and B.R. are very young children and need permanent placement. Furthermore, the statutory provisions are designed to ensure that abuse, neglect, and/or dependency cases are resolved within 24 months. R.C. 2151.353(G) and 2151.413(D)(1). This case had already been pending approximately 16 months. The mother also could have raised her concerns with the juvenile court at an earlier time so that any alleged impediments could have been remedied immediately. *In re K.J.*, 9th Dist. Summit No. 29149, 2019-Ohio-123, ¶ 23.

{¶ 38} Therefore, we find the mother's sole assignment of error not well-taken.

17.

**Maternal Grandfather's Appeal**

{¶ 39} The maternal grandfather, A.R. asserts in his first "assignment of error" that the trial court's decision to deny his motion to intervene was contrary to the manifest weight of the evidence. However, he actually argues in the body of his brief that the decision to deny him legal custody was contrary to the manifest weight of the evidence. We will address both issues.

{¶ 40} The trial court denied the motion to intervene on the basis that A.R. had not established he has a legal right to custody or visitation with the children and therefore does not meet the definition of "party" as set forth in Juv.R. 2(Y).

{¶ 41} Juv.R. 2(Y) defines a party as including "any other person specifically designated by the court." Therefore, the juvenile court has the discretion to designate someone as a party to an abuse, neglect, and dependency case who is necessary to fully resolve the issues before the court. *In re A.B., M.B., J.B., A.P.*, 2018-Ohio-4206, 114 N.E.3d 421, ¶ 6 (6th Dist.) (citation omitted); *In re Baker*, 7th Dist. Harrison No. 98 507 CA, 1999 WL 783973, *3 (Sept. 28, 1999) (citations omitted).

{¶ 42} On appeal, we will not overturn the juvenile court's decision absent a showing that the court abused its discretion. *Id*. The party who sought to intervene in a termination action may appeal the denial of the motion to intervene. *State ex rel. N.G. v. Cuyahoga Cty. Court of Common Pleas*, 147 Ohio St.3d 432, 2016-Ohio-1519, 67 N.E.3d 728, ¶ 28.

18.

{¶ 43} Appellant fails to argue how the juvenile court abused its discretion and we do not find any abuse. It is not an abuse of discretion to deny a motion to intervene filed by a grandparent who did not stand in loco parentis to the child. *In re Schmidt*, 25 Ohio St.3d 331, 337, 496 N.E.2d 952 (1986); *In re N.M.*, 2016-Ohio-7967, 74 N.E.3d 852, ¶ 14 (8th Dist.).

{¶ 44} Second, we address the issue of the trial court's decision denying appellant legal custody of C.R. and B.R. In determining the best interests of the children, the juvenile court considered that: the children have some special needs and that A.R. had not been enforcing the rule that C.R. wear her corrective glasses; the guardian ad litem and CASA representative were concerned whether A.R. could set appropriate boundaries for the children and follow agency recommendations; the mother appeared to be under the influence while in A.R.'s home; C.R. and B.R. were currently living with a good foster family who were willing to adopt them and maintain their biological family relationships; and these children were in need of secure, permanent placement.

{¶ 45} Upon a review of the evidence, we find the trial court's factual findings were supported by clear and convincing evidence. Furthermore, we find the trial court did not abuse its discretion in denying A.R.'s motion for legal custody.

{¶ 46} Therefore, we find A.R.'s first "assignment of error" is not well-taken.

{¶ 47} In his second "assignment of error," A.R. argues we should review how the ongoing caseworker and the agency conducted their duties in this case. He also asserted that the ongoing caseworker abused her powers or duties as a caseworker.

19.

**{¶ 48}** We note that A.R. never raised this issue in the trial court where it could have been resolved. *See In re A.C.*, 8th Dist. Cuyahoga No. 108236, 2019-Ohio-4788, ¶ 46-48. Therefore, he has forfeited the right to raise the issue on appeal. *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 44. Furthermore, an appeal from the determination of the juvenile court's disposition order would not be an appropriate forum for adjudicating the issues A.R. asserts because not all of the facts he alleges would be in the record on appeal.

**{¶ 49}** Therefore, we find A.R.'s second "assignment of error" not well-taken.

**{¶ 50}** Having found that the trial court did not commit error prejudicial to appellants and that substantial justice has been done, the judgment of the Ottawa County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, appellants are hereby ordered to split the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

Thomas J. Osowik, J. _____

Christine E. Mayle, J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.